**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>FERNANDO CAZARES, AKA SNEAKY,<br>*Defendant-Appellant*. | No. 06-50677<br><br>D.C. No.<br>CR-04-00415-PA<br>-04 |

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>GILBERT SALDANA,<br>*Defendant-Appellant*. | No. 06-50678<br><br>D.C. No.<br>CR-04-00415-PA<br>-02 |

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>ALEJANDRO MARTINEZ,<br>*Defendant-Appellant*. | No. 06-50679<br><br>D.C. No.<br>CR-04-00415-PA<br>-01 |

UNITED STATES OF AMERICA,
                *Plaintiff-Appellee*,

v.

PORFIRIO AVILA, AKA Dreamer,
                *Defendant-Appellant*.

No. 07-50037

D.C. No.
CR-04-00415-PA
-05

OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued October 11, 2012
Submitted May 14, 2015
Pasadena, California

Filed May 14, 2015

Before: Harry Pregerson and William A. Fletcher, Circuit
Judges, and Lawrence L. Piersol,* Senior District Judge.

Opinion by Judge Piersol

---

* The Honorable Lawrence L. Piersol, Senior District Judge for the U.S.
District Court for South Dakota, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed the convictions of (1) Fernando Cazares, Gilbert Saldana, Alejandro Martinez, and Porfirio Avla, all members of the Avenues 43 Latino street gang, for violating 18 U.S.C. § 241 by conspiring to intimidate African-American citizens in the Highland Park neighborhood of Los Angeles and to deprive them of their constitutional right to "purchase, lease and hold real and personal property, and the right to occupy a dwelling, free from intimidation based on race"; and (2) Cazares, Saldana, and Martinez for violating (a) 18 U.S.C. §§ 245(b)(2)(B), and 2(a) by shooting Kenneth Kurry Wilson, an African-American man, because of his race and color and because he was enjoying facilities provided and administered by a subdivision of the State; and (b) 18 U.S.C. §§ 924(c)(1)(A)(iii), (j)(1) and 2(a) by using firearms to kill Wilson while carrying out the charged conspiracy.

The panel held that the defendants' due process rights were not violated by their being shackled to their chairs during the trial.

The panel wrote that the reasons stated by the district court for holding most of the voir dire in private would not be sufficient to avoid a determination that the defendants' rights to a public trial were violated, but held that the defendants

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

validly waived their right to be present at voir dire and their right to a public trial.

The panel held that admission of hearsay statements pursuant to the doctrine of forfeiture by wrongdoing was not reversible error.

The panel held that it was improper expert testimony and a violation of Fed. R. Evid. 703 for an officer to identify Avenues gang members and the officers assigned to the investigations of Avenues as his source for characterizing Martinez, Saldana, and Avila as the most violent members of the Avenues and the members with the most clout. The panel held that more general testimony regarding the Avenues gang members' attitudes towards black people is permissible, but that if there was error in allowing the officer to testify regarding those attitudes, it most likely did not have a substantial effect on the jury's verdict. The panel held that the defendants cannot on this record establish that admission of the officer's testimony constituted plain error under the Confrontation Clause.

The panel held that the district court did not err in denying Saldana's motion to suppress statements he made to the police without being given his *Miranda* rights, where Saldana was never in custody.

The panel rejected as waived, and on the ground of invited error, the defendants' claim that their rights under the Confrontation Clause were violated by testimony, in response to a question asked during cross-examination, regarding a non-testimonial conversation being gang members.

The panel rejected the defendants' contention that the district court denied the defendants their rights to effective cross-examination and confrontation by limiting and precluding cross-examination of four witnesses.

The panel held that any error in permitting the government's expert to testify that her firearm identification findings were made to a "scientific certainty" was harmless.

The panel held that § 245(b)(2)(B) is constitutional as applied to this case.

The panel concluded that the overall effect of any errors that were committed do not violate the defendants' due process rights to a fair trial.

---

**COUNSEL**

Verna Wefald (argued), Law Offices of Verna Wefald, Pasadena, California, for Defendant-Appellant Fernando Cazares.

Wayne R. Young (argued), Law Office of Wayne R. Young, Santa Monica, California, for Defendant-Appellant Alejandro Martinez.

Jonathan Libby (argued), Deputy Federal Public Defender, Sean K. Kennedy, Federal Public Defender, Federal Public Defender's Office, Los Angeles, California, for Defendant-Appellant Gilbert Saldana.

Karen L. Landau (argued), Law Office of Karen L. Landau, Oakland, California, for Defendant-Appellant Porfirio Avila.

Thomas E. Chandler (argued) and Jessica Dunsay Silver, Attorneys, Thomas E. Perez, Assistant Attorney General, Department of Justice, Civil Rights Division, Appellate Section, Washington, D.C., for Plaintiff-Appellee.

**OPINION**

PIERSOL, Senior District Judge:

A jury found defendants Fernando Cazares, Gilbert Saldana, Alejandro Martinez, and Porfirio Avila guilty of violating 18 U.S.C. § 241 by conspiring to intimidate African-American citizens in the Highland Park neighborhood of Los Angeles and to deprive them of their constitutional right to "purchase, lease and hold real and personal property, and the right to occupy a dwelling, free from intimidation based on race." The jury found defendants Cazares, Saldana, and Martinez guilty of violating 18 U.S.C. §§ 245(b)(2)(B), and 2(a) by shooting Kenneth Kurry Wilson, an African-American man, because of his race and color and because he was enjoying facilities provided and administered by a subdivision of the State, namely the public streets of Los Angeles. The jury also found defendants Cazares, Saldana, and Martinez guilty of violating 18 U.S.C. §§ 924(c)(1)(A)(iii), (j)(1) and 2(a) by using firearms to kill Kenneth Kurry Wilson while carrying out the charged conspiracy.

The defendants are members of the Avenues 43, a Latino street gang in the Highland Park area, an area inhabited predominantly by Latinos. One of the tenets of the Avenues 43 was to harass and use violence to drive African-Americans out of the Highland Park area. The conspiracy charged in the

Second Superseding Indictment alleges overt acts continuing from 1995 through 2001 and involving racial slurs, threats, assaults, harassment, and murder directed at African-American residents of the Highland Park area, with the intent of causing the African-American residents to leave the Highland Park area.

Several black residents and former residents of the Highland Park area testified as to the harassment and violence the black residents of the Highland Park area suffered at the hands of the Avenues 43 gang members. The government also relied heavily on the testimony of former Avenues gang members, Jesse Diaz and Jose De La Cruz, who were incarcerated on state convictions, for evidence specific to the defendants.

The district court sentenced Saldana, Cazares, and Martinez each to two consecutive sentences of life imprisonment and sentenced Avila to life imprisonment.

All of the defendants allege constitutional errors during trial based on their being shackled to their chairs, their not being present for most of the voir dire, the admission of hearsay, and the limiting of cross examination of several government witnesses. All of the defendants allege the district court abused its discretion by allowing improper gang expert testimony and by permitting another government's expert to testify that her firearm identifications were made to a scientific certainty. Defendants Saldana, Cazares, and Martinez argue that Count Two of the Superseding Indictment should have been dismissed because 18 U.S.C. § 245(b)(2)(b) is unconstitutional on its face and as applied to this case because its enactment and enforcement in the case of a murder committed on a public street exceeds Congress's

limited powers.  All of the defendants argue that the alleged cumulative errors at trial deprived them of their Fifth Amendment Due Process rights to a fair trial.

Defendant Gilbert Saldana submitted a supplemental opening brief contending that the district court erred in denying his motion to suppress statements made without *Miranda* warnings.  The district court denied Saldana's suppression motion mid-trial without making findings or stating the basis of the ruling on the record.  We issued an unpublished memorandum disposition reversing the denial of Saldana's motion to suppress and remanding to the district court for fact finding on whether Saldana was in custody when he made these statements to the police.  We deferred submission of the rest of the appeal pending the district court's fact finding.  *See United States v. Cazares*, 517 F. App'x 597 (9th Cir. 2013).  The district court later issued and filed with this Court seven pages of findings of fact in support of the denial of Saldana's motion to suppress.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. We affirm on all issues.

## DISCUSSION

## I.

## THE USE OF SHACKLES

Defendants contend their rights to due process were violated by being shackled to their chairs during the trial.  We review the decision to shackle defendants during trial under an abuse of discretion standard.  *Morgan v. Bunnell*, 24 F.3d 49, 50 (9th Cir. 1994) (per curiam).  We place restrictions,

however, on that discretion in that: (1) "the court must be persuaded by compelling circumstances that some measure was needed to maintain the security of the courtroom"; and (2) "the court must pursue less restrictive alternatives before imposing physical restraints." *United States v. Fernandez*, 388 F.3d 1199, 1245 (9th Cir. 2004) (quoting *Jones v. Meyer*, 899 F.2d 883, 885 (9th Cir. 1990)).

*Factual Background Concerning Shackling*

Before trial, counsel for Cazares submitted a declaration expressing his concern that the defendants would be handcuffed with shackles on their legs and chained to their seats at trial. Counsel based his concern on the fact that the trial was ordered to be held in the Roybal security courtroom and that at prior proceedings in that courtroom the marshals had handcuffed, shackled, and chained defendants to their seats. Counsel for Cazares declared under oath that at each court proceeding he attended the defendants had behaved as gentlemen and had not exhibited any behavior or demeanor that would indicate an intention to disrupt proceedings, escape, or assault anyone. In initially ruling on the issue the district court stated, "I wouldn't be over here in this courtroom if I was – this courtroom, I guess, was built by taxpayers' expense for cases like this, and so, at least at this point, I'm going to deny that motion without prejudice, and we'll see."

At the beginning of the trial, after it was called to the court's attention that some of the prospective jurors had seen the defendants shackled on a video feed in a different courtroom, the potential jurors were questioned and the few that had possibly seen the shackles were excused. A three-and-a-half to four-foot barrier had been placed in the

courtroom to prevent the jurors from seeing shackles or handcuffs when the defendants were seated.  A journalist, however, saw that the defendants were shackled to their chairs and reported in the Los Angeles Times that the defendants were shackled but that when they were seated the shackling was not visible.  The district court called the article to the attention of counsel and proposed cautioning the jury again about not reading anything about the case and inquiring whether any prospective juror had in fact read any articles about the case.  Defense counsel restated their objection, moved for a mistrial, and moved to unshackle the defendants from the chairs so they could stand at appropriate times.  The district court responded that he would talk to the marshals, but noted that two of the defendants were serving life terms for murder from state proceedings.

The district court took the shackles into his consideration from the outset of the trial.  If the voir dire had been conducted at sidebar the jurors would likely have been able to see the defendants' shackles.  The district court therefore decided against doing individual juror questioning at sidebar. At the beginning of the voir dire process, the district court said, "I think we will do this [i.e., voir dire] over in the jury room across the hall there because there is a chance that they could see something back here. Okay. So I will just tell them we are going to do this over there."  In context, it is quite clear that when the judge said that "there is a chance they could see something back here" he was talking about prospective jurors seeing defendants' shackling from the angle at which the sidebar would take place.

During the course of voir dire, counsel for the defendants renewed their objection to the jury pool.  The district court denied the motion at the time because he did not find that

there had been any taint of the prospective jurors, but advised that he would take action if a level of taint was established. The district court continued to question potential jurors about whether they had seen the defendants on the monitor.  One of the potential jurors responded that he had seen the defendants escorted in the courtroom and that '[i]t looked like they had handcuffs on behind their backs."  This potential juror also stated, "I think we all just looked at it, and I don't think anybody really said anything."

The district court dismissed all but six of the panel that had been in the courtroom with the video monitor.  Those six were seated in the jury box and the district court concluded that they had not seen the defendants on the monitor.  Other potential jurors denied seeing the defendants on the monitor before voir dire commenced.  A few stated that they had seen the defendants on the monitor before voir dire commenced, but that the defendants were seated.  Another prospective juror stated that he had seen on the monitor what he assumed to be, possibly incorrectly, a defendant walking in the courtroom.  After voir dire was completed, the district court announced that all the potential jurors who had possibly seen the defendants in shackles had been excused and that the district court was satisfied that the panel was not tainted.  The district court again pointed out the placement of the barrier that prevented the jurors from seeing any shackles or handcuffs when the defendants were seated.  Counsel objected to the shackling, because it would prevent the defendants from getting up and down during the trial, and renewed the motion for mistrial.  Counsel also moved the district court for an order to unshackle the defendants from their chairs, so that even though they were wearing leg shackles they could stand up and down throughout the trial. The district court responded to the renewed motion by stating

that he would talk to the marshals and by again noting that at least two of the defendants were serving life sentences for murder. Based on the Los Angeles Times article referencing the shackles, the district court then asked the potential jurors if any had read a news report regarding the case, but none of the potential jurors responded.

*Applicable Law on Shackling*

"[G]iven their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." *Deck v. Missouri*, 544 U.S. 622, 632 (2005). The rationale against shackling is that "[v]isible shackling undermines the presumption of innocence and the related fairness of the factfinding process." *Id.* at 630. "In the presence of the jury, [the defendant] is ordinarily entitled to be relieved of handcuffs, or other unusual restraints, so as not to mark him as an obviously bad man or to suggest that the fact of his guilt is a foregone conclusion." *Stewart v. Corbin*, 850 F.2d 492, 497 (9th Cir. 1988) (citation omitted). A trial court may order that a defendant be shackled during trial only after the trial court is "persuaded by compelling circumstances that some measure is needed to maintain security of the courtroom" and if the trial court pursues "less restrictive alternatives before imposing physical restraints." *Duckett v. Godinez*, 67 F.3d 734, 748 (9th Cir. 1995) (quotation marks and citation omitted).

In deciding whether less restrictive alternatives to shackling exist, a trial court must begin by assessing the disadvantages and limitations if shackles are applied to a defendant. *Spain v. Rushen*, 883 F.2d 712, 721 (9th Cir. 1989). Such disadvantages and limitations include

(1) reversal of the presumption of innocence, (2) impairment of the defendant's mental ability, (3) impeding of communication between the defendant and his counsel, (4) detraction from the decorum of the trial, and (5) pain. *Id.* "After considering these factors, the trial judge 'must weigh the benefits and [these] burdens of shackling against other possible alternatives.'" *Jones*, 899 F.2d at 885 (9th Cir. 1990) (alteration in original) (quoting *Spain*, 883 F.2d at 721).

There are no explicit findings in the record regarding the existence of compelling circumstances or the possibility of less restrictive alternatives to shackling. "Yet we have never held, and we refuse to hold now, that a trial court must conduct a hearing and make findings before ordering that a defendant be shackled." *Id.* at 886.

The district court judge in this case was conducting a trial in which all four defendants were members of a violent gang, two of the defendants had already been sentenced to life sentences in state court, and all of the defendants were facing life sentences as a result of the federal charges. It is apparent from the record that the district court judge consulted with the marshals regarding the security considerations inherent in shackling. We have held that a trial judge has wide discretion to decide whether increased security measures are required when dealing with a defendant who has a propensity for violence. *Morgan*, 24 F.3d at 51. To reduce the risk of prejudice from the shackling, the district court judge carefully questioned the potential jurors during voir dire to preclude seating jurors who had seen any defendants in shackles on the monitor. In addition, the barrier that was placed in the courtroom to prevent the jurors from seeing the shackles minimized or eliminated the disadvantages of shackles

regarding reversal of the presumption of innocence and detraction from the decorum of the trial. Visibility of the shackles is critical to the determination of the due process issue. *United States v. Mejia*, 559 F.3d 1113, 1117 (9th Cir. 2009); *see also Williams v. Woodford*, 384 F.3d 567, 592 (9th Cir. 2004) ("When the jury never saw the defendant's shackles in the courtroom, we have held that the shackles did not prejudice the defendant's right to a fair trial."). Defendants have made no claims and presented no evidence regarding the shackles affecting their mental abilities or communications with counsel, or causing them pain. Even if the district court did not fully state on the record his reasons for shackling and his assessment of less restrictive alternatives before ordering shackling in this case, the defendants are not entitled to a reversal based on this record.

In *Cox v. Ayers*, we set forth four factors that a criminal defendant must satisfy to establish that his shackling at trial amounted to a due process violation. 613 F.3d 883, 890 (9th Cir. 2010). These four factors are (1) that the defendant was physically restrained in the presence of the jury; (2) that the shackling was seen by the jury; (3) that the physical restraint was not justified by state interests; and (4) that he suffered prejudice as result of the shackling. *Id.* (quoting *Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th Cir. 2002)). These factors are not present in this case.

Defendants acknowledge that it is not clear whether any of the sitting jurors actually saw them in shackles. Defendants argue, however, that even if the jurors did not see the leg and waist shackles, they had to believe the defendants were dangerous based on the district court judge questioning and based on the defendants' immobility during a trial in a

courtroom in which the marshals outnumbered the defendants.

This argument is not persuasive. The voir dire questioning did not suggest any characteristic of the defendants. In addition, as the district court judge explained in response to the request to unshackle the defendants, there is no expectation of mobility of defendants in the courtroom during a trial. The shackles were not visible and the defendants' due process rights were not violated by the shackling.[1]

## II.

## VOIR DIRE CONDUCTED OUTSIDE THE PRESENCE OF THE DEFENDANTS AND PUBLIC

Defendants contend their constitutional rights to a public trial and to be present at trial were violated when the district court conducted much of the voir dire in camera and outside their presence. Defendants concede that they did not object to voir dire being conducted in camera, so this Court reviews the issue for plain error. *United States v. Mageno*, 762 F.3d 933, 940 (9th Cir. 2014). "First, for us to reverse the jury verdict in this case, there must be error that is plain." *Id.* at 943 (emphasis omitted). Even then, we must find that the error seriously affected "the fairness, integrity, or public reputation of the judicial proceedings" before exercising discretion to correct the error. *Id.* at 940 (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

---

[1] In addition, the unconstitutional shackling of a defendant results in prejudice only if the evidence of guilt is not "overwhelming." *Cox*, 613 F.3d at 891. The evidence of guilt in this case was overwhelming.

*Factual Background on Right to be Present and to Public Trial*

Jury selection in this case took over five-and-one-half days. Most of the voir dire took place outside the presence of the defendants and the public in a jury room. Defense counsel, however, was present. Although appearances, instruction, admonitions, general voir dire, and exercise of peremptory challenges took place in open court, substantial questioning of prospective jurors regarding whether they had seen or heard the defendants on the video monitor, questioning regarding hardship and bias, and legal argument, took place in the jury room outside the presence of the defendants and the public. The trial transcript repeatedly references that voir dire was being held in the jury room outside the presence of the defendants.

The district court had a reason for not conducting voir dire at sidebar. As was indicated in the previous discussion concerning shackling, if the voir dire had been conducted at sidebar, the prospective jurors would likely have been able to see the defendants' shackles. As a result, the district court decided against hardship and other voir dire questioning at sidebar. At the beginning of voir dire, the district judge said, "I think we will do this [i.e., voir dire] over in the jury room across the hall there, because there is a chance that they could see something back here. Okay. So I will just tell them we are going to do this over there." In context, it is quite clear that when the judge said that "there is a chance they could see something back here" he was talking about prospective jurors seeing defendants' shackling from the angle at which the voir dire sidebar examination of prospective jurors would take place.

Neither defendants nor their counsel objected to the voir dire taking place in the jury room outside the presence of the defendants and the public. In fact, one of the defendant's counsel stated: "I think that the selection ought to be done the same way as it was done earlier because it would look a little odd if the new – the jurors already seated, having gone through this rather extensive private interviews, now see that the new batch doesn't have that."

At one point the district court advised of his intent to question jurors about vacation time in another courtroom and stated, "I guess I need to probably get a waiver from your clients." One of the defendant's counsel responded, "Your Honor, I can't imagine my client would have an objection to us going over and doing that." Before the district court and counsel moved to the other courtroom the district court inquired of each defendant whether he objected to proceeding in this manner. Each defendant consented orally on the record to this plan. When jury selection was finished and defense counsel was asked if there was any legal cause why the jury panel should not be sworn, each defendant's counsel responded "no."

*Right to be Present at Voir Dire*

Federal Rule of Criminal Procedure 43(a)(2) states that unless provided otherwise a defendant must be present at "every trial stage, including jury impanelment." In *United States v. Gagnon*, the Court explained the constitutional basis of the right of a defendant to be present at his court proceedings:

> The constitutional right to presence is rooted
> to a large extent in the Confrontation Clause

of the Sixth Amendment, *e.g., Illinois v. Allen*, 397 U.S. 337 (1970), but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him.  In *Snyder v. Massachusetts*, 291 U.S. 97 (1934), the Court explained that a defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge . . . . [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Id*. at 105–06, 108; *see also Faretta v. California*, 422 U.S. 806, 819 n.15 (1975).  The Court also cautioned in *Snyder* that the exclusion of a defendant from a trial proceeding should be considered in light of the whole record.  291 U.S. at 115.

470 U.S. 522, 526 (1985) (per curiam).  Further, under the Due Process Clause, "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987).

In *Gomez v. United States*, the Court discussed the significance of voir dire:

[I]n affirming *voir dire* as a critical stage of the criminal proceeding, during which the

defendant has a constitutional right to be present, the Court wrote: "'[W]here the indictment is for a felony, the trial commences at least from the time when the work of empanelling the jury begins.'" *Lewis v. United States*, 146 U.S. 370, 374 (1892) (quoting *Hopt v. Utah*, 110 U.S. 574, 578 (1884)). *See Swain v. Alabama*, 380 U.S. 202, 219 (1965) (*voir dire* "a necessary part of trial by jury"); *see also Ricketts v. Adamson*, 483 U.S. 1, 3 (1987); *United States v. Powell*, 469 U.S. 57, 66 (1984). Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice, *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981); *Ham v. South Carolina*, 409 U.S. 524 (1973)*; Dennis v. United States*, 339 U.S. 162 (1950), or predisposition about the defendant's culpability, *Irvin v. Dowd*, 366 U.S. 717 (1961).

490 U.S. 858, 873 (1989). The right of a defendant to be present during all critical stages of the court proceedings is subject to harmless error analysis, unless that deprivation, by its nature, cannot be considered harmless. *Rushen v. Spain*, 464 U.S. 114, 117–21 (1983) (per curiam) (holding that an unrecorded ex parte communication between a trial judge and juror was harmless error).

*Right to a Public Trial*

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the

right to a speedy and public trial." The Sixth Amendment right to a public trial extends beyond the actual proof presented at a trial. *See, e.g.*, *Waller v. Georgia*, 467 U.S. 39, 44–47 (1984) (pretrial suppression hearing must be open to the public). The Supreme Court has held that the right to a public trial extends beyond the accused and can be invoked under the First Amendment. *Press-Enterprise Co. v. Superior Court of Cal., Riverside Cnty.*, 464 U.S. 501 (1984).

In *Presley v. Georgia*, the Court held that a defendant's Sixth Amendment right to a public trial was violated when the trial court excluded the public from the voir dire of prospective jurors. 558 U.S. 209, 213 (2010) (per curiam). In *Presley*, the trial court advised a courtroom observer, the defendant's uncle, that he would not be allowed in the courtroom while the jury was selected but that he could come in after jury selection. When counsel for the defendant objected to the exclusion of the public from the courtroom, the trial court explained that there was not space for the public to sit in the audience and that there was "really no need for the uncle to be present during jury selection." *Id.* at 210. The Court concluded that the question of whether the Sixth Amendment right to a jury trial extends to jury voir dire was so well settled that it could proceed by summary disposition:

> The point is well settled under *Press-Enterprise I* and *Waller*. The extent to which the First and Sixth Amendment public trial rights are coextensive is an open question, and it is not necessary here to speculate whether or in what circumstances the reach or protections of one might be greater than the other. Still, there is no legitimate reason, at least in the context of juror selection proceedings, to give

> one who asserts a First Amendment privilege greater rights to insist on public proceedings than the accused has. "Our cases have uniformly recognized the public-trial guarantee as one created for the benefit of the defendant." *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979). There could be no explanation for barring the accused from raising a constitutional right that is unmistakably for his or her benefit. That rationale suffices to resolve the instant matter.

*Id.* at 213.

The Supreme Court in *Presley* admonished that "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Id.* at 215. Although the Supreme Court acknowledged circumstances that would warrant closing voir dire to the public, the Court directed that "in those cases, the particular interest, and threat to that interest, must 'be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.'" *Id.* (quoting *Press-Enterprise*, 464 U.S. at 510).

The district court in this case stated that its "practice, generally," and especially in longer cases, was to conduct hardship voir dire in the jury room. The district court explained that addressing hardship issues in the adjacent conference room "will just be easier and nobody will be able to hear us." The district court also stated that he was bringing in the prospective jurors one at a time to the jury room to consider hardship issues because "if people don't get the idea that people are getting out, it may keep it down to a

reasonable number." Had any of the defendants asserted their rights to a public trial, the reasons stated by the district court for holding most of voir dire in private would not be sufficient to avoid a determination that the defendants' rights to a public trial were violated. The United States argues that although the district court did not expressly make the *Presley* finding, it was clear that the district court was conducting the individual voir dire in private because of the nature of the bias and hardship questions. The questions asked were not of an intensely personal nature so that argument is not supported by the record.

*Harmless Error or Structural Error*

In *Arizona v. Fulminante*, the Supreme Court divided constitutional errors into two classes: trial errors and structural defects. 499 U.S. 279, 307 (1991). Trial errors "occurred during presentation of the case to the jury" and their effect may "be quantitatively assessed in the context of other evidence presented in order to determine whether [they] were] harmless beyond a reasonable doubt." *Id.* at 307–08. Structural defects, however, "defy analysis by 'harmless-error' standards" because they "affect[] the framework within which the trial proceeds," and are not "simply an error in the trial process itself." *Id.* at 309–10. The denial of the right to public trial has been categorized as a structural defect. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 (2006) (citing *Waller*, 467 U.S. at 49, n.9). If the right to a public trial had not been waived, defendants would have a persuasive argument that their right to a public trial was violated when most of voir dire was conducted in private.

"The Supreme Court has never held that the exclusion of a defendant from a critical stage of his criminal proceedings constitutes a structural error." *Campbell v. Rice*, 408 F.3d 1166, 1172 (9th Cir. 2005). In making this statement, we relied on *Rushen v. Spain*, in which the Supreme Court found that a juror's ex parte communication with the trial judge was harmless beyond a reasonable doubt. 464 U.S. at 117–21. In *United States v. Gagnon*, the Supreme Court emphasized, "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" 470 U.S. at 526 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934)).

In *Gagnon*, the district court judge had a communication with a juror who was concerned that one of the defendants was sketching the juror. The district court advised in open court that he was going to have this communication without the defendants being present, and no objection was made. *Id.* at 523. The Supreme Court characterized the communication as follows:

> The encounter between the judge, the juror, and Gagnon's lawyer was a short interlude in a complex trial; the conference was not the sort of event which every defendant had a right personally to attend under the Fifth Amendment. Respondents could have done nothing had they been at the conference, nor would they have gained anything by attending.

*Id.* at 527. The private voir dire in the case at hand was not "a short interlude" to the extent that it took place for most of

the five-and-one-half days of voir dire. However, it is difficult to see how the defendants' presence would have changed the composition of the jury panel, *see Gray v. Mississippi*, 481 U.S. 648, 665 (1987), or otherwise affected the outcome of the case. It is unclear what defendants would have gained by attending the voir dire, especially since their counsel was in attendance. Nonetheless, the defendants should have been in attendance to view prospective jurors, see the reactions, both oral and physical, of prospective jurors to questioning, and consult with their defense counsel.

*Waiver*

We have recognized that "[a]lthough a defendant charged with a felony has a fundamental right to be present during voir dire, this right may be waived." *United States v. Sherwood*, 98 F.3d 402, 407 (9th Cir. 1996) (citing *Campbell v. Wood*, 18 F.3d 662, 672–73 (9th Cir. 1994) (en banc) (defendant in a capital case waived his right to be present during voir dire by expressing his desire not to be present); s*ee also Gagnon*, 470 U.S. at 529 ("We hold that failure by a criminal defendant to invoke his right to be present under Federal Rule of Criminal Procedure 43 at a conference which he knows is taking place between the judge and a juror in chambers constitutes a valid waiver of that right."). The right to a public trial can also be waived. *See Levine v. United States*, 362 U.S. 610, 619 (1960) ("The continuing exclusion of the public in this case is not to [be] deemed contrary to the requirements of the Due Process Clause without a request having been made to the trial judge to open the courtroom at the final stage of the proceeding . . . .").

"[C]ourts must indulge every reasonable presumption against the loss of constitutional rights." *Illinois v. Allen*,

397 U.S. 337, 343 (1970) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  In *Campbell v. Wood*, we explained:

> A waiver is an "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). The finding of a knowing and voluntary waiver is a mixed question of law and fact which we review *de novo*. *Terrovona v. Kincheloe*, 852 F.2d 424, 427 (9th Cir. 1988). The ultimate issue of voluntariness is a legal question requiring independent federal determination. *Arizona v. Fulminante*, 499 U.S. 279, 286 (1991).

18 F.3d at 672.

Defendants contend without citing supporting authority that "[b]y being shackled they could not possibly have asserted their rights to be present."  The United States argues that there is "no connection" between being shackled and being able to assert their right to be present or to have an open trial.  There is arguably some connection between being shackled and not asserting the right to be present in the jury room for the private voir dire as there is no evidence that the barrier which hid the shackles in the courtroom was available in the jury room where most of the voir dire took place.  Also, as a matter of logistics, moving the shackled defendants may have required some extra time and effort.  If defendants had objected to the voir dire being conducted in the jury room, the voir dire could have been held in the courtroom where there was a barrier which hid the shackles.  However, defendants could have asserted their rights and "[t]he district court need not get an express 'on the record' waiver from the defendant

for every trial conference which a defendant may have a right to attend." *Gagnon*, 470 U.S. at 528. None of the defendants nor their counsel ever requested that the defendants be present at the portion of the voir dire that took place in the jury room. When the district court requested a waiver of the defendants' presence for a portion of the voir dire, the defendants each gave the waiver on the record. In addition, counsel for one of the defendants requested that the private voir dire continue in the manner it was proceeding. The facts of this case support finding a valid waiver of the right to be present at voir dire and a valid waiver of the right to a public trial.

## III.

## WHETHER THE DISTRICT COURT COMMITTED PREJUDICIAL ERROR IN ADMITTING HEARSAY PURSUANT TO THE DOCTRINE OF FORFEITURE BY WRONGDOING

The district court's resolution of Confrontation Clause claims is reviewed de novo. *United States v. Berry*, 683 F.3d 1015, 1020 (9th Cir. 2012). Additionally, "we review de novo the district court's construction of hearsay rules, but review for abuse of discretion the court's determination to admit hearsay evidence." *United States v. Marguet-Pillado*, 560 F.3d 1078, 1081 (9th Cir. 2009).

*Factual Background on Doctrine of Forfeiture by Wrongdoing Issue*

One of the defendants, Porfirio Avila, , a/k/a "Dreamer," and another Avenues gang member, Rene Madel, had been convicted of murder in state court for the murder of

Christopher Bowser before the federal trial in this matter was held. The assaults and later murder of Bowser were set forth as overt acts in the Second Superseding Indictment. After Bowser was assaulted and robbed on October 26, 2000, Bowser reported the crimes to the Los Angeles Police Department. Defendant Alejandro Martinez, a/k/a "Bird," was subsequently arrested for the assault and robbery. As set forth in testimony of Avila's former brother-in-law David Cruz, a/k/a "Mousey," which was contained in the state court murder trial transcript and reviewed by the district court before trial, Martinez then directed Avila and Madel to kill Bowser. On December 11, 2000, Avila and Madel shot and killed Bowser.

In presenting the evidence concerning Christopher Bowser, the government elicited testimony from several sources regarding out-of-court statements made by Bowser implicating the Avenues, and Martinez in particular, in the initial assaults and assault and robbery. Several witnesses testified to Bowser having a long history of being harassed by the Avenues. The government contended that Bowser's statements were admissible under the "forfeiture by wrongdoing" exception to the hearsay rule. The district court, over the defendants' objections, allowed Bowser's statements to be admitted in evidence subject to a motion to strike.

LAPD Officer Fernando Carrasco testified that on October 26, 2000, he responded to a call on a robbery investigation and spoke with Bowser who told him he had been punched, kicked, and robbed of a necklace by two Hispanic men while he was waiting at a bus stop. Officer Carrasco also testified that Bowser told him he recognized one of the Hispanic men as "Bird" from the Avenues and told

Carrasco that he had had previous run-ins with "Bird." Officer Carrasco testified that Bowser was initially hesitant to press charges and stated that "he feared for his safety. He feared retaliation."

Officer John Padilla, a detective for the City of Los Angeles, testified that he was assigned to do a follow-up investigation on the assault and robbery against Bowser. Officer Padilla testified that on November 28, 2000, he received a note at his desk that Bowser wanted to press charges against "Bird" because "Bird" had driven by him in a car and pointed a gun at him. Officer Padilla testified that he went to Bowser's house in Highland Park on November 30, 2000, and interviewed Bowser. Officer Padilla testified that at this interview Bowser said he was robbed by "Bird" and another. Officer Padilla further testified that Bowser stated he had been assaulted and called the N-word by "Bird" on several occasions. Bowser then identified "Bird" on a photo lineup and circled "Bird's" photograph. Under the photograph Bowser, in the presence of Officer Padilla, wrote, "'Bird,' No. 6, stole my chain and assaulted me." Bowser signed and dated the note. Martinez was arrested on December 3, 2000. Bowser was shot and killed on December 11, 2000.

*Right to Confrontation, Forfeiture by Wrongdoing, and Rule 804(b)(6)*

The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford v. Washington*, the Supreme Court held out-of-court statements by witnesses that are testimonial are barred, under the Confrontation Clause, unless the

witnesses are unavailable and a defendant had a prior opportunity to cross-examine the witnesses, regardless of whether such statements are deemed reliable by the court. 541 U.S. 36, 53–54 (2004). The decision in *Crawford* abrogated *Ohio v. Roberts*, which allowed the admission of a statement of a hearsay declarant who is unavailable for trial if it bears "adequate 'indicia of reliability.'" 448 U.S. 56, 66 (1980). In *Crawford* the Supreme Court held that statements taken by police officers in the course of interrogations are testimonial under even a narrow standard. 541 U.S. at 52. The Court held that the Confrontation Clause gives a defendant the right to cross-examine witnesses who give testimony against him, except in cases where an exception to the right of confrontation was recognized at the time of the founding. *Id.* at 53–54.

In *Giles v. California*, the Supreme Court examined the "forfeiture by wrongdoing" doctrine. 554 U.S. 353 (2008). In *Giles*, California unsuccessfully argued that whenever a defendant committed an act of wrongdoing that rendered a witness unavailable, the defendant forfeited his right to object to the witness's testimony on confrontation grounds. *Id.* at 364–65. In rejecting this argument the Court stated, "American courts never—prior to 1985—invoked forfeiture outside the context of deliberate witness tampering." *Id.* at 366.

In *Giles*, the Court cited to *Crawford* and the previous acknowledgment of two forms of unconfronted testimonial statements that were admitted at common law. The first founding-era exception to the right of confrontation is "declarations made by a speaker who was both on the brink of death and aware that he was dying." *Id.* at 358. The second founding-era exception to the right of confrontation,

and the one relevant to the case at hand, is forfeiture by wrongdoing, a doctrine which permitted the admission of "statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant." *Id.* at 359.

In examining the history of the doctrine of forfeiture by wrongdoing, the Court observed, "In cases where the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying—as in the typical murder case involving accusatorial statements by the victim—the testimony was excluded unless it was confronted or fell within the dying-declarations exception." *Id.* at 361–62.

In *Davis v. Washington*, 547 U.S. 813 (2006), the Supreme Court explained:

> [W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they *do* have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system. We reiterate what we said in *Crawford*: that "the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds." 541 U.S. at 62. That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation.

*Id.* at 833.

The Supreme Court in *Giles* observed that in 1997 it had approved Rule 804(b)(6), a rule "which codifies the forfeiture doctrine." 554 U.S. at 367 (quoting *Davis*, 547 U.S. at 833). Rule 804(b)(6) provides that a "statement offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result" is not excluded by the rule against hearsay if the declarant is unavailable as a witness. Causing the declarant's unavailability with the intent of doing so is critical to the doctrine of forfeiture by wrongdoing. *See United States v. Leal-Del Carmen*, 697 F.3d 964, 974 (9th Cir. 2012) (holding videotape admissible under the forfeiture by wrongdoing hearsay exception because the Government was responsible for rendering the declarant unavailable as a witness).

Rule 804(b)(6) applies to those who "acquiesced in wrongfully causing—the declarant's unavailability." A number of courts have ruled that a witness's statement may be admissible under Rule 804(b)(6) against a defendant conspirator who did not directly procure the unavailability of the witness, so long as a coconspirator had done so, the misconduct was within the scope and in furtherance of the conspiracy, and the misconduct was reasonably foreseeable to the conspirator. *See United States v. Cherry*, 217 F.3d 811, 820 (10th Cir. 2000); *United States v. Rivera*, 292 F. Supp. 2d 827, 833 (E.D. Va. 2003). The factors supporting application of Rule 804(b)(6) are to be determined based on a preponderance of the evidence. *Davis*, 547 U.S. at 833; *Cherry*, 217 F.3d at 821; *United States v. Emery*, 186 F.3d 921, 926 (8th Cir. 1999).

*District Court's Application of Forfeiture by Wrongdoing Doctrine*

Defendants argue that the district court misconstrued the scope of the forfeiture by wrongdoing doctrine and violated their Confrontation Clause rights because the Government did not show that the defendants had Bowser killed for the purpose of rendering him unable to testify. Defendants argue that the court made no finding on the question whether Mr. Bowser was killed for this purpose.

Immediately before the jury returned its verdict in this case, the district court put on the record the basis for its admission of the Bowser statements under the forfeiture by wrongdoing doctrine. The district court stated: "I wanted to set out some of the reasons why I found that there was a preponderance of evidence that the defendants Avila and Martinez and others directly engaged in wrongdoing that was *intended to* and did render Chris Bowser unavailable as a witness." (Emphasis added.) The district court then stated that the reasons for his ruling included, but were not limited to: (1) That Bowser complained about being harassed by members of the Avenues, including Martinez; (2) That Bowser had been beaten by individuals wearing blue uniform shirts that Avila and Martinez wore for employment; (3) That Bowser reported to the police that Martinez had robbed him and Martinez was then arrested for the assault; (4) That the mother of Bowser's child testified Bowser told her in the days leading up to his death that he wanted to see his child because the Avenues were after him; (5) That Bowser was killed eight days after he told the police that Martinez had robbed him; (6) That Bowser was killed execution style at the same bus stop where he reported being robbed and assaulted; (7) That the pattern of shots used in the Bowser murder was identical

to that in another local murder of an African-American (Anthony Prudhomme); (8) That the testimony given by Mousey in *People v. Avila* set forth that Martinez had ordered Avila and Madel to kill Bowser and that Avila had admitted having done so to Mousey; (9) That the district court had taken judicial notice of Avila's convictions for murdering Bowser and Prudhomme; and (10) That the district court had taken judicial notice of Martinez's conviction for the robbery of Bowser and the fact that the Bowser murder was charged as an overt act in furtherance of the conspiracy.

In addition to these reasons, the evidence at trial established that five days after Bowser's murder, a fellow gang member who was incarcerated in state prison took part in a recorded telephone conversation with Avila in which Avila admitted that he and Martinez assaulted Bowser. In this conversation Avila stated that Bowser reported the assault and that the police raided Martinez's residence. Avila then commented, "That fool's gone." Also, Mousey testified in the state court proceeding that Martinez's order from the jail to kill Bowser was also because of Bowser being a witness against Martinez.

The district court acted properly in admitting the Bowser statements at trial contingent upon proof of the elements for admission by a preponderance of the evidence. *See Emery*, 186 F.3d at 926. The federal courts "have sought to effect the purpose of the forfeiture-by-wrongdoing exception by construing broadly the elements required for its application." *United States v. Gray*, 405 F.3d 227, 242 (4th Cir. 2005). The government is not required to show that a defendant's sole purpose was to silence the declarant. *See United States v. Dhinsa*, 243 F.3d 635, 654 (2d Cir. 2001). The district court's stated reasons and the record as a whole clearly

support the application of the forfeiture by wrongdoing doctrine with regard to defendants Avila and Martinez. The fact that Mousey's credibility and testimony was subject to attack does not, as defendants argue, support the defendants' position that the evidence was insufficient to support a determination that Bowser's murder was undertaken to prevent him from giving testimony.

The district court should have articulated that the Bowser murder was within the scope of and in furtherance of the conspiracy, and that the murder was reasonably foreseeable to the defendants other than Martinez and Avila so that the forfeiture by wrongdoing doctrine applied to all who had "acquiesced in wrongfully causing—the declarant's unavailability." *Cherry*, 217 F.3d at 811; Fed. R. Evid. 804(b)(6). However, if there was any error in the failure to do so, the error appears to be harmless. There was a plethora of evidence other than Bowser's statements that the Avenues harassed blacks and Bowser in particular. Also, the testimonial statements that Bowser made to the officers, for the most part, implicated only Martinez. The admission of the Bowser statements does not constitute reversible error.

## IV.

## WHETHER THE TESTIMONY OF THE GOVERNMENT'S EXPERT WITNESS VIOLATED RULE 703 AND DEFENDANTS' CONFRONTATION RIGHTS

We review the district court's admission of expert testimony for abuse of discretion. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 460 (9th Cir. 2014) (en banc). "A district court's rulings on the admissibility of

expert testimony . . . will be reversed only if 'manifestly erroneous.'" *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997)). Defendants now challenge a portion of the testimony of the gang expert on Confrontation Clause grounds, but failed to object on those grounds before the district court. We review de novo a district court's admission of evidence in alleged violation of the Confrontation Clause. However, if a defendant failed to object to the admission of evidence under the Confrontation Clause, we review for plain error. *United States v. Hagege*, 437 F.3d 943, 956 (9th Cir. 2006).

*Factual Background on Expert Witness Lopez Issue*

The government called LAPD Lt. Robert Lopez as an expert on street gangs, including the Avenues, that reside in the Northeast Division. At the time of trial Lopez was a 28-year veteran of the LAPD with 25 years of working with gangs. He was the detective in charge of the Northeast gang unit. Lopez attended specialized training and seminars on gangs, and had taught gang investigation. Lopez talked to between 200 and 400 Avenues gang members over the years and talked to other law enforcement officers who were in contact with Avenues gang members. Lopez had either investigated or supervised over 500 Avenues cases in the past twelve years. The district court overruled defendants' objections to the government's offer of Lopez as an expert on the Avenues gang. Then the district court instructed the jury that opinion testimony should be judged like any other testimony, and could be accepted, rejected, or given as much weight as the jurors thought it deserved considering the witness's education, experience, and reasoning, as well as all of the other evidence in the case.

Lopez testified about the structure, membership requirements, practices, graffiti, and slang of the Avenues gang. Defendants contend that other testimony of Lopez served merely to relay inadmissible hearsay to the jury. In particular, defendants challenge the admission of Lopez's opinion about the racial attitudes of the Avenues gang. Defendants contend that the testimony regarding racial attitudes consisted entirely of hearsay and was neither admissible nor helpful to the jury as required by Rule 703.

Lopez testified as to his observation that with the increase of black people moving into the Highland Park neighborhood there was a change in the Avenues' crimes, in that the Avenues' crimes targeted black individuals and families in the area. Lopez testified that he talked to black people in the neighborhood and to officers working the crimes about this development. The government then asked, "Based on those interactions, do you have any opinion about whether the Avenues gang members had any racial attitudes?" The defendants objected on the grounds that it was not the proper subject of expert opinion in that it goes to one of the elements charged, that there was inadequate foundation, that expert testimony was not necessary in this area, and that it was beyond Lopez's expertise. After a sidebar conference the prosecutor asked whether Lopez had an opinion as to how the Avenues gang members felt about the increase in the black population in Highland Park. Lopez testified that they hated it. The district court allowed Lopez to testify as to the basis of his opinion, and Lopez testified that based on interviews of the community members, the Avenues gang members, and detectives and officers assigned to his unit, it was his opinion that black people moving in to the neighborhood was changing the makeup of the neighborhood and the Avenues gang members weren't happy with it.

While eliciting the testimony regarding the Avenues gang members' attitudes towards black people, the prosecutor engaged in the following questioning:

> Q: Just to be clear, Lieutenant Lopez, when you talk about the Avenues' attitudes towards black people in the neighborhood, you are not offering any opinion about whether any of these defendants acted with racial intent on any particular occasion; correct?
>
> A: Correct.
>
> Q: You are just talking in general terms?
>
> A: Yes, ma'am.

Lopez's testimony was not so general with regard to the unofficial hierarchy of the Avenues gang. Lopez testified that conversations he had with the Avenues gang members and the officers assigned to the investigations of the Avenues led him to conclude that the oldest and most violent members would be revered and have extra clout. Lopez was then allowed, over a defense relevancy objection, to opine whether any member of the Avenues 43 had that extra clout. Lopez identified defendants Martinez and to a certain extent, Saldana and Avila, as being in that category.

*Gang Expert Testimony and Rule 703*

Experts may be used to testify to matters outside the expected knowledge of the average juror. Fed. R. Evid. 702; *see also Hankey*, 203 F.3d at 1167. Expert witnesses may rely on inadmissible hearsay in forming their opinions, so

long as it is of a type reasonably relied upon by experts in their field. Fed. R. Evid. 703; *Hankey*, 203 F.3d at 1169. In *Hankey*, we upheld the admission of expert testimony of an officer with experience and sources of information similar to that possessed by Officer Lopez. As we explained:

> Certainly the officer relied on "street intelligence" for his opinions about gang membership and tenets. How else can one obtain this encyclopedic knowledge of identifiable gangs? Gangs such as involved here do not have by-laws, organizational minutes, or any other normal means of identification-although as [the officer] testified, some wear colors, give signs, bear tattoos, etc. [The officer] was repeatedly asked the basis for his opinions and fully articulated the basis, demonstrating that the information upon which he relied is of the type normally obtained in his day-to-day police activity.

203 F.3d at 1169–70.

Defendants are challenging the testimony given by Officer Lopez which extended beyond "general background information about gangs" and "specialized testimony regarding matters beyond the jury's ken." Defendants rely upon *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), as authority that this expert witness was used as a subterfuge to introduce otherwise inadmissible hearsay. In *Mejia*, a case in which a police officer who was a member of a gang task force testified as an expert in prosecution of gang members, the Second Circuit cautioned:

Yet despite the utility of, and need for, expertise of this sort, its use must be limited to those issues where sociological knowledge is appropriate. An increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence. If the officer expert strays beyond the bounds of appropriately "expert" matters, that officer becomes, rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt. As the officer's purported expertise narrows from "organized crime" to "this particular gang," from the meaning of "capo" to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them.

*Id.* at 190.

Defendants also argue that Officer Lopez's testimony resulted in the prohibited disclosure of inadmissible hearsay upon which he based some of his testimony. Rule 703 provides:

>An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  *But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.*

(Emphasis added.)

We have recognized that to the extent that inadmissible evidence is reasonably relied upon by an expert, a limiting instruction typically is needed to limit the use of that evidence.  *United States v. Grace*, 504 F.3d 745, 759 n.7 (9th Cir. 2007); *United States v. 0.59 Acres of Land*, 109 F.3d 1493, 1496 (9th Cir. 1997).  No limiting instruction was requested or given after the testimony in issue.

It was improper expert testimony and a violation of Rule 703 for Officer Lopez to identify Avenues gang members and the officers assigned to the investigations of the Avenues as his source for characterizing defendants Martinez, Saldana, and Avila as the most violent members of the Avenues and the members with the most clout.  The more general testimony regarding the Avenues gang members' attitudes towards black people is permissible under *Hankey*.

*Harmless error on Admission of expert testimony*

An error is harmless unless it results in actual prejudice, which is demonstrated where "the error in question had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Winzer v. Hall*, 494 F.3d 1192, 1201 (9th Cir. 2007) (quoting *Brecht v. Abramson*, 507 U.S. 619, 623 (1993)). Defendants maintain that since Count One, the conspiracy against rights charged under 18 U.S.C. § 241, and Count Two, the interference with federally protected rights charged under 18 U.S.C. § 245(b)(2)(B), required the jury to find the Defendants acted based on their victims' race, the admission of Avenues gang members' attitudes towards black people could not be harmless error. Defendants also contend that this testimony was not harmless because it corroborated the disputed testimony of Diaz and De La Cruz, who the defendants characterize as "highly unreliable," on the issue of whether all African-Americans, not just members of other gangs, were subject to attack.

If there was error in allowing Lopez to testify regarding the Avenues gang members' attitudes towards black people, it most likely did not have a substantial effect on the jury's verdict. Lopez clarified that he was not offering an opinion on the racial attitudes of the individual defendants. Further, there was abundant testimony from black residents of the Highland Park area regarding the racial attitudes of the Avenues gang members. Also, in light of the entire record, one could not conclude that Officer Lopez's brief testimony characterizing defendants Martinez, Saldana, and Avila as the most violent members of the Avenues and as the members with the most clout, had a substantial and injurious effect on the jury's verdict.

*Confrontation Clause and Plain Error*

The Confrontation Clause applies only to testimonial hearsay.   *Crawford*, 541 U.S. at 51.    Statements are testimonial when made in the course of police interrogation when the "primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822.  The record is deficient in establishing Lopez's primary purpose in gathering the information regarding the defendants' violent character and role in the Avenues.  Since defendants failed to object on Confrontation Clause grounds, plain error review applies to a Confrontation Clause claim.  *Hagege*, 437 F.3d at 956. Error is plain when it is clear or obvious under the law. Defendants cannot establish plain error on this record.

## V.

## WHETHER THE DISTRICT COURT ERRED IN DENYING DEFENDANT SALDANA'S MOTION TO SUPPRESS STATEMENTS HE MADE TO THE POLICE WITHOUT BEING GIVEN HIS *MIRANDA* RIGHTS

The ultimate question of whether a confession is voluntary and admissible is subject to de novo review, but the district court's underlying factual findings are reviewed for clear error. *United States v. Brobst*, 558 F.3d 982, 995 (9th Cir. 2009).  Whether a person is "in custody" for purposes of *Miranda* is a mixed question of law and fact that is reviewed de novo. *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002).

*Factual Background of Suppression Issue*

Saul Audelo, a suspect in the murder of Renee Cerda, was interviewed by police. Audelo admitted owning a 9 millimeter Ruger and said he sold it to defendant Saldana after the Cerda murder. Detectives investigating the Cerda murder obtained a search warrant for Saldana's residence in order to find the gun.

At 7:00 a.m. on May 6, 1999, police officers executed the search warrant at the home of Juana Saldana, Saldana's mother, where Saldana, his mother, brother, and sister lived. Saldana had just showered after returning home after working a double shift at Vandenburg Air Force Base. The other family members were sleeping. The officers moved all of the occupants into the living room where they were seated on the couch. The district court concluded on remand that Saldana was not handcuffed at any time. That factual finding in the face of conflicting evidence is not clearly erroneous. After the search, Saldana was moved into a bedroom where officers questioned him about the 9 millimeter Ruger. The officers then led Saldana out of the house and into a car. Saldana was given the option of driving his car to the police station or riding with Detective Gabriel Rivas. That any choice was given was denied by the defense, but the district court's factual finding is not clearly erroneous. Saldana rode with the Detective to the Hollenbeck police station. Saldana was questioned by two or three officers in an 8 by 10 interview room at the station. A transcript of the recorded interview at the station shows he was told that he was not under arrest. Saldana admitted to purchasing a 9 millimeter firearm from Audelo, but said he no longer had the weapon. He was asked to find the weapon and contact Detective Rivas, which he agreed to do. During the police station questioning,

detectives did not threaten or suggest to Saldana that he would be placed under arrest or prosecuted, nor did they brandish their weapons. The district court also found that no pressure or coercive tactics were employed by the detectives either during the search or the subsequent interviews. The district court also found that Saldana was told during the questioning he was free to leave the police station. There is no dispute that Saldana was not given *Miranda* warnings. Saldana was permitted to leave the interview room and the police station.

The police later were informed that Saldana had participated in the Wilson murder and had used a 9 millimeter gun he obtained from another gang member. Subsequently, the gun was connected to both the Cerda and the Wilson murders. Saldana filed a pre-trial motion to suppress his statements made in the May 6, 1999 interview at the police station. Witness declarations were submitted by the parties. The district court held hearings on the motion to suppress at which Saldana, his brother, his sister, two detectives, and an FBI agent testified. The day the government called Audelo and Detective Rivas as witnesses at the trial of this case, the district court denied the motion to suppress Saldana's statements without explanation. The court stated that it would either write something or state its reasons later on the record. The parties agree that was not done and the matter was remanded to the district court. Thereafter, the district court filed its seven page Findings of Fact in Support of the Denial of Gilbert Saldana's Motion to Suppress.

*Applicable Law on Suppression of Statements*

In *Miranda v. Arizona*, the Supreme Court established that, when a person is "in custody," procedural safeguards

must be afforded that person before the person is questioned. Otherwise, the prosecution may not use what it learns through its interrogation. 384 U.S. 436, 444 (1966). The Court reasoned that the privilege against self-incrimination is protected by adequately and effectively advising an individual of his or her rights. *Id.* at 467. It is undisputed that Saldana was not read or told of his Miranda rights before, during, or after the interview on May 6, 1999.

The question is whether Saldana was "in custody" while being questioned. "To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Kim*, 292 F.3d at 973 (alteration in original) (internal quotation marks and citation omitted). The court must "examine the totality of the circumstances surrounding the interrogation." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008). A defendant is in custody if a "reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981). The custody determination is objective and is not based upon "the subjective views of the officers or the individual being questioned." *Kim*, 292 F.3d at 973.

Facts relevant to the determination of whether a person is in custody "include the language used by the officers, the physical characteristics of the place where the questioning occurs, the degree of pressure applied to detain the individual, the duration of the detention, and the extent to which the person was confronted with evidence of guilt." *United States v. Hernandez*, 476 F.3d 791, 796 (9th Cir. 2007) (quoting

*United States v. Butler*, 249 F.3d 1094, 1099 (9th Cir. 2001));
*accord United States v. Hayden*, 260 F.3d 1062, 1066 (9th
Cir. 2001) ("Factors relevant to whether an accused is 'in
custody' include the following: (1) the language used to
summon the individual; (2) the extent to which the defendant
is confronted with evidence of guilt; (3) the physical
surroundings of the interrogation; (4) the duration of the
detention; and (5) the degree of pressure applied to detain the
individual."). "While determining whether a defendant is
constitutionally entitled to Miranda warnings is subject to de
novo review, it is nevertheless a fact-intensive inquiry."
*United States v. Wright*, 625 F.3d 583, 602 (9th Cir. 2010)
(citing *Craighead*, 539 F.3d at 1082, 1084).

*Discussion*

There are factual disputes concerning the circumstances
of the interview at the police station. The record indicates
that the audiotape or recording of the interview may be
incomplete. Saldana was told "you were not under arrest,"
but the transcript of the recording does not reflect that
Saldana was told he was free to leave but on remand the
district court found that Saldana was told he was free to leave
while at the police station. The language used by the officers
in the taped interview at the police station was neutral even
though it did direct the questioning. There is no showing of
other language being used previously at the home of
Saldana's mother where he lived. Three or four officers took
Saldana to another room for an initial questioning while the
search went on. There were at least 10 officers participating
in the search, with at least 7 of them in the house with a
number of police cars parked in the street. The police station
interview room was small, about 8 by 10 feet, and there were
two and sometimes three officers in the room. Saldana drank

one cup of coffee and was offered a second cup of coffee. The recorded interview was about 10 minutes long and the interview may have started before the recording device was activated. Saldana was not confronted with evidence of guilt as the officers stated they only wanted to get the gun. As a convicted felon, Saldana would be incriminating himself by merely admitting he had possessed the handgun. But that was not the focus of the search nor of the questioning. The factual finding on conflicting evidence is that there was no detention. It is about a 30 minute drive from the house to the police station. Finally, there was no pressure applied to detain Saldana.

Under the facts as found by the district court, and after examining all of the circumstances surrounding the questioning, there was no formal arrest or restraint of freedom of movement of the degree associated with formal arrest.

The defense claims it is inconceivable that the LAPD would not place a convicted murderer in handcuffs while they conducted an early morning search at his home. The district court has the best opportunity to both hear and observe the witnesses and to judge their credibility. Based upon the findings of the district court, Defendant Saldana was never in custody and was not entitled to a *Miranda* warning. His statements to the LAPD were properly admissible.

## VI.

## WHETHER DEFENDANTS' RIGHTS UNDER THE CONFRONTATION CLAUSE WERE VIOLATED BY HEARSAY TESTIMONY OF SAUL AUDELO REGARDING THE CERDA MURDERS AND THE GUN USED TO COMMIT THOSE MURDERS

The district court's resolution of Confrontation Clause claims is reviewed de novo. *Berry*, 683 F.3d at 1020. Additionally, "we review de novo the district court's construction of hearsay rules, but review for abuse of discretion the court's determination to admit hearsay evidence." *Marguet-Pillado*, 560 F.3d at 1081. If a defendant has both invited error and relinquished a known right then the error is waived and the court can decline review. *United States v. Nguyen*, 565 F.3d 668, 676 (9th Cir. 2009).

*Factual Background of Audelo hearsay testimony issue*

Saul Audelo, a former prison bunkmate of defendant Gilbert Saldana, was convicted in state court of killing Jaime and Rene Cerda. The Cerda murders occurred February 22, 1999. Audelo was a member of the Los Angeles White Fence gang. After Audelo and Saldana were released from jail they maintained a friendship and Audelo sold Saldana guns, including "burnt" guns, or guns that had been used in a crime. Audelo was asked at his trial, "Did you sell the gun used in the Serta (sic) murders to Gilbert Saldana?" The defendants objected on foundation grounds and the district court sustained the objection.

The defendants contended that the only way Audelo knew of what gun was used at the Cerda murders was through hearsay since Audelo claimed he was not involved in the Cerda murders, even though a jury in state court convicted him of those murders.  After a sidebar conference, the prosecutor asked Audelo: "Did you have possession of the firearm used during those [Cerda] murders?"  Audelo answered in the affirmative to that question, and to the question of whether he sold that firearm to anyone.  Audelo testified that he sold the gun to Lucky (defendant Gilbert Saldana).  Audelo also testified that the gun in issue, a 9 millimeter Ruger, was one of about five weapons that he had sold Saldana.  Audelo testified that Saldana usually came with defendant Martinez (Bird) and Merced Cambero (Shadow) when the guns were sold.  The government maintains that the same 9 millimeter Ruger used in the Cerda murders was used to kill Kenneth Wilson on April 18, 1999.

During cross examination of Audelo, Saldana's attorney elicited testimony from Audelo that he had claimed he was not present at the Cerda murders.  Saldana's attorney then asked: "So your claim that you made here today that the weapon that you sold to Mr. Saldana was used in the Rene Serta (sic) murder is based upon what someone else told you. Is that your claim?"  Audelo answered: "By the shooter himself, yes."  Saldana's attorney followed with, "Well, you say the murderer himself; Is that correct?"  Audelo agreed.

Earlier, at a hearing outside the presence of the jury, Audelo testified that after he sold the 9 millimeter Ruger to Saldana, Ponyboy (Salvador Ramos) told him that he had used the 9 millimeter Ruger in the Cerda murders.  After the hearing the district court overruled Saldana's hearsay and confrontation clause objections.  The 9 millimeter Ruger was

not produced at trial as it was not in the possession of the government. A firearms examiner with the LAPD later testified at trial that the bullets and bullet casings from the Wilson murder were fired from the same gun as had been used in the Cerda murders — a 9 millimeter Ruger. The government never called Ramos to testify.

*Confrontation Clause Argument*

Defendants contend that there was a Confrontation Clause violation when Audelo testified in response to a question asked during cross examination that he heard from the murderer that the gun sold to Saldana was used in the Cerda murders (for which Audelo was convicted). The Confrontation Clause, however, applies only to testimonial hearsay. *Crawford*, 541 U.S. at 51. Statements are testimonial when made "to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. A conversation between two gang members about the journey of their burnt gun is not testimonial. In addition, defense counsel clearly invited this testimony.

Defendants appear to be challenging the government putting on a witness who claims not to have firsthand knowledge of at least part of the testimony he is expected to give. This argument is compromised to some degree by Audelo's murder conviction in the Cerda case. More importantly, defendants fail to cite authority for this argument and the cited authority does not support defendants' confrontation clause argument. The failure to cite to valid legal authority waives a claim for appellate review. *See Acosta-Huerta v. Estelle*, 7 F.3d 139, 144 (9th Cir. 1992). For these reasons and the fact that error was invited, defendants are not entitled to relief on this issue.

# VII.

## WHETHER THE DISTRICT COURT DENIED DEFENDANTS THEIR RIGHTS TO EFFECTIVE CROSS-EXAMINATION AND CONFRONTATION BY LIMITING AND PRECLUDING CROSS EXAMINATION

"If the defendant raises a Confrontation Clause challenge based on the exclusion of an area of inquiry, we review de novo." *United States v. Larson*, 495 F.3d 1094, 1101 (9th Cir. 2007) (en banc). However, "[a] challenge to a trial court's restrictions on the manner or scope of cross-examination on nonconstitutional grounds is . . . reviewed for abuse of discretion." *Id.*

### General Principles

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974) (quoting 5 J. Wigmore, Evidence § 1395, at 123 (3d ed. 1940)). Improperly restricting defense counsel's cross-examination, when that examination is designed to show bias on the part of a prosecution witness, violates a defendant's Confrontation Clause rights. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). We, like the Supreme Court, have "'emphasized the policy favoring expansive witness cross-examination in criminal trials.'" *Larson*, 495 F.3d at 1102 (quoting *United States v. Lo*, 231 F.3d 471, 482 (9th Cir. 2000)).

This Court has also recognized:

> The constitutional right to cross examine is
> "[s]ubject always to the broad discretion of a
> trial judge to preclude repetitive and unduly
> harassing interrogation," but that limitation
> cannot preclude a defendant from asking, not
> only "*whether* [the witness] was biased" but
> also "to make a record from which to argue
> *why* [the witness] might have been biased."

*United States v. Schoneberg*, 396 F.3d 1036, 1042 (9th Cir.
2005) (quoting *Davis v. Alaska*, 415 U.S. at 316, 318)
(alterations in original) (footnotes omitted).

We have identified three factors to be considered in
determining whether a defendant's right to cross-examination
has been violated: (1) whether the excluded evidence was
relevant; (2) whether other legitimate interests outweighed
the defendant's interest in presenting the excluded evidence;
and (3) whether the exclusion of evidence left the jury with
sufficient information to assess the credibility of the witness
the defendant was attempting to cross-examine. *Larson*,
495 F.3d at 1103 (citing *United States v. Beardslee*, 197 F.3d
378, 383 (9th Cir. 1999)). The limitation on the
cross-examination of each witness is reviewed separately. *Id*.

*Factual Background Concerning Cross-Examination and
Confrontation Issue*

Defendants claim that the district court improperly limited
cross-examination of witnesses Jesse Diaz, Jose De La Cruz,
Saul Audelo, and Eneida Montano.

*Jesse Diaz*: Jesse Diaz had been convicted of attempted murder and was sentenced to 20 years in 1999.  Diaz was an Avenues gang member and testified about the gang's activities.  Diaz testified that he was present with Defendants Martinez, Cazares, and Saldana when Kenneth Wilson was murdered and testified as to the details of that event.  Diaz had 10 years remaining on his state sentence at the time of trial and testified on direct examination that the government would be sending a letter to the state court judge and any reduction would be up to the state court judge.

Defendants complain that Saldana's counsel was not allowed to cross-examine Diaz on the fact that he had been outed as a snitch at a preliminary hearing.  Saldana's counsel, in fact, cross-examined on this point.  Defendants complain that Saldana's counsel could not explore Diaz's knowledge of whether he knew the punishment he could be subject to in the State of California for murder.  Counsel for Saldana, in fact, was allowed to question Diaz whether he knew the punishment for murder and attempted murder.  Counsel also questioned Diaz as to whether he made a deal with the detective so he "would never be prosecuted by the State of California for Murder."

Defendants also complain that counsel for Saldana could not explore whether Diaz knew Sam Salinas.  Counsel for Saldana, in fact, asked Diaz about Sam Salinas and Diaz stated twice that he did not know Sam Salinas.

Diaz was an important witness.  However, defense counsel cross-examined Diaz extensively on his bias, motives, and inconsistencies.  There was no Sixth Amendment violation with regard to Diaz.

*Jose De La Cruz*: Jose De La Cruz had been a member of the Cypress Avenues gang and was serving 45 years to life for the murder of Kenneth Wilson.  De La Cruz was also with defendants Martinez, Cazares, and Saldana when Kenneth Wilson was murdered and testified as to the details of that event.  De La Cruz had also spent time with the defendants engaging in gang activities and testified to the details of these activities.

Defendants contend their rights were violated when counsel for Saldana was not allowed to question De La Cruz about detectives telling De La Cruz that Saldana would take the stand against him.  Counsel for Saldana conducted the following cross-examination in this area:

> Q:  Is part of what motivated you to cooperate with the police the fact that they told you that Gilbert Saldana was putting this thing on you.
>
> [objection overruled by district court]
>
> A:  That had nothing to do with it.
>
> Q:  So you thought it was okay that Gilbert Saldana was putting the murder on you?
>
> A:  I knew he wasn't.

Defendants contend their rights were violated when the district court sustained an objection about De La Cruz having a shank in prison.  Counsel asked and De La Cruz answered whether he had been arraigned on possession of a shank. Although further questioning about possession of the shank

was objected to and disallowed based on Rule 609, counsel asked without objection, "Well, were you concerned at that time for your own personal safety in the county jail because you knew that you had snitched out some of your fellow gang members?"

Defendants contend their rights were violated when the district court sustained an objection about De La Cruz never having killed a black man before the murder of Kenneth Wilson.  Defendants make a meritless claim that the "question goes directly to the indictment's allegation that there was an ongoing conspiracy among De La Cruz's gang to kill Black people."

Defendants contend their rights were violated when the district court sustained an objection to an incomplete question about the FBI telling De La Cruz they were making a case about Kenneth Wilson being killed because of racial hatred. However, before the objection was sustained the following questioning took place:

> Q: Now, it wasn't until November of 2003 that you mentioned the motivation for killing Mr. Wilson as being that he was African American; isn't that correct?

> A: That's right.

> Q:  And when the FBI spoke to you , they made it very clear that they were interested – that they were investigating a case dealing with racial hatred; isn't that correct?

A:  That's right.

Defendants contend their rights were violated when the district court sustained objections to questions concerning attorney communications and plea bargaining for the Wilson homicide.  Testimony was elicited from De La Cruz, however, establishing that he was negotiating a better deal.

De La Cruz was also an important witness.  However, defense counsel cross-examined De La Cruz extensively on his bias, motives, and inconsistencies.  There was no Sixth Amendment violation with regard to De La Cruz.

*Saul Audelo*: Saul Audelo was Saldana's former prison bunkmate.  Audelo had been convicted in state court of killing Jaime and Rene Cerda.  Audelo testified to selling Saldana the 9 millimeter Ruger the government contends was used to kill Kenneth Wilson.

Defendants contend their rights were violated when the district court sustained objections to questions concerning the conditions of his confinement "in order to flesh out reasons why he was cooperating."  Audelo, in fact, gave testimony in cross-examination that it was difficult for his family to visit him, that he had been in lock down a number of times, and that he didn't like being incarcerated and wanted to go home.

Audelo was also an important witness.  Defense counsel cross-examined him extensively on bias, motives, and inconsistencies.  There was no Sixth Amendment violations concerning Audelo.

*Eneida Montano*: Eneida Montano had been Saldana's former girlfriend.  She testified as to Saldana's use of the N-

word or "myate" (Spanish slang for the same). Defendants contend their rights were violated because they could not impeach Montano on whether she had stated Saldana used the N-word or just the term "myate." Defendants further contend their rights were violated because they could not impeach Montano regarding her inability to recall testimony to the grand jury despite her training to be a deputy sheriff.

Montano was not an especially important witness and the areas of restricted cross-examination were not that important. There was no Sixth Amendment violation with regard to Montano.

There was extensive cross-examination of all the witnesses in this case. Defendants have cited only a few instances, and some are cited out of context, with regard to limitations placed on cross-examination. With regard to each of the witnesses listed above, very little evidence was excluded from their cross-examinations and the exclusion of this small amount of evidence still left the jury with sufficient information to assess the credibility of the witness the defendant was attempting to cross-examine. *Larson*, 495 F.3d at 1103.

## VIII.

## WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION BY PERMITTING THE GOVERNMENT'S EXPERT TO TESTIFY THAT HER FIREARM IDENTIFICATION FINDINGS WERE MADE TO A "SCIENTIFIC CERTAINTY"

We review the district court's admission of expert testimony for abuse of discretion. *Estate of Barabin*,

740 F.3d at 460. The government contends the defendants failed to raise their objections properly and that plain error applies.

*Factual and Procedural Background on Firearms Expert Testimony Issue*

Defendants filed a motion in limine requesting the district court exclude ballistics evidence in this case under *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993), and Rule 702. At a pretrial hearing the district court advised that he did not need a hearing on the ballistics issue at that point but that he would perform his gate-keeping function.

During trial and outside the presence of the jury, counsel for Saldana renewed his motion in limine to preclude the testimony of the government's ballistics expert on the grounds that the expert's conclusions concerning the matches in the Wilson and Cerda murders and the Bowser and Prudhomme murders lacked statistical reliability. Counsel for Saldana argued: "So, at the very least, aside from keeping out her testimony, I assume that your Honor is going to overrule my objection, I would ask that she be precluded from saying that this is an absolute match . . . ."

The government advised that the witness would conclude she matched the evidence in her opinion to a scientific certainty. The district court found that "tool mark identification method, ballistics analysis employed essentially by the government's witness is reasonably reliable and will likely be helpful to the jury," and that the defense could cross-examine on reliability. Although the district court noted there had been criticism of tool mark identification by some scholars, he felt the methodology was still accepted in

criminal trials. The other defendants joined Saldana's motion and the district court denied the motion.

At the jury trial in this case the government called Diana Paul as an expert witness. Paul worked for the LAPD Firearms Analysis Unit as a criminalist and firearms examiner. Paul testified that she had been a firearms expert for approximately 15 years, and that she had a Master of Science degree in criminalistics. She further testified that the majority of her training came from a two-year, on-the-job training program with the LAPD Firearms Analysis Unit. She then passed a competency test which included both a written and practical component. Paul engaged in ongoing training in workshops and training seminars put on by forensic organizations, including a class offered by the FBI at Quantico, Virginia, designed specifically for forensic firearm and tool mark examination. Paul subscribed to forensic science journals and over the years she had analyzed approximately 2500 cases in the LAPD Firearms Analysis Unit. Paul had testified specifically in firearms analysis between 200 and 250 times.

When the government offered Diana Paul as an expert in the area of firearms analysis, defendant Saldana objected. The district court found Paul qualified and then instructed the jury that opinion testimony should be judged like other testimony, and that it could be accepted, rejected, or given as much weight as the jury believed it deserved. Paul testified that her standard, the Associates of Firearms and Toolmark Examiners (AFTE) standard, was more conservative than that of others and that "I am not comfortable writing a report or reporting something that is not in my mind to a scientific certainty." Paul also testified during direct examination that there is a subjective element to her job so she insures the

quality of her work with four different areas of quality control.

Paul examined fired shot shells, fired cartridge cases, fired bullets, and shot shell components from the Kenneth Wilson murder crime scene. Paul found the shot shells were fired from the same gun. Paul examined fired casings with the caliber designation of a 9 millimeter Luger from the Kenneth Wilson murder crime scene and compared them to the casings from the Rene Cerda murder and testified that they were fired from the same firearm. When the government asked how confident Paul was that the casing left behind at the Cerda murder was fired out of the same gun as was fired in the Wilson murder, Saldana objected for lack of foundation in terms of probability. The objection was initially sustained, but over the objection of counsel Paul was allowed to testify that the 9 millimeter Ruger could have fired the casings in both scenes, though she could not be certain. Paul also testified that she examined a bullet that was taken from Kenneth Wilson's body and compared it to bullets at the scene and concluded they were fired from different firearms. She further testified, over defense objections on foundation and speculation, that there were at least three firearms used in the Kenneth Wilson crime. This testimony corresponds with the testimony given by Diaz and De La Cruz.

In her testimony Paul also compared firearms evidence from the Christopher Bowser murder of December 11, 2000, and the Anthony Prudhomme murder of November 3, 2000. Another detective testified over defense objection at trial that he observed "an immediate nexus" between the Bowser and Prudhomme murder scenes, because Prudhomme was also a black male Highlands Park area victim who was killed with a gunshot wound to the back of the head just weeks before the

Bowser murder. Paul examined three cartridge cases and bullet evidence from the Bowser murder crime scene. Paul testified that the three casings had a .25 auto caliber designation and that they were fired from the same firearm. Paul further testified that she examined two casings from the Prudhomme murder scene and concluded they were fired from the same firearm. There were no objections to this testimony. Paul also testified that she compared the bullet evidence from the Bowser murder with the bullet evidence from the Prudhomme murder, and concluded they were fired from the same firearm. There was no objection made at the time this testimony was given.

Paul was extensively cross-examined about her methodology, analysis, and basis for conclusions. Paul conceded during cross-examination that the conclusion that a particular bullet was fired by the same firearm as another bullet is ultimately a subjective evaluation. Paul also conceded that there was no statistical database from which she could prove that no other firearm could have fired the particular bullet. On redirect examination, however, Paul testified as follows (without objection) regarding her findings in this case: "I am completely certain. If I was not completely certain, I would have written a report saying that it was inconclusive. I would not have said that it was a match, the two were fired in the same gun." She testified that was the case in the Wilson and Cerda comparisons and the Bowser and Prudhomme comparisons. Paul then testified, without objection from the defense, that her findings were made with a scientific certainty, but acknowledged, "There is no absolute certainty in science."

During closing arguments the prosecutor stated that "the most important corroboration to Diaz's and De La Cruz's

testimony that Saldana shot at Wilson's car with a 9 millimeter gun he purchased from a White Fence gang member was Paul's testimony "to a scientific certainty."

*Toolmark Identification Expert Testimony*

On September 26, 2012, defendants submitted supplemental authority on the issue of whether the district court erred by permitting the governments's firearms expert to testify to a scientific certainty about her firearms identification findings. The authority, *United States v. Otero*, 849 F. Supp. 2d 425 (D.N.J. 2012), contains a thorough discussion on the reliability of forensic toolmark examination utilized to identify the firearm from which a discharged ammunition originated. The district court issued its decision after it conducted a three-day *Daubert* hearing. The decision explains, "According to the theory of toolmark identification espoused by the Association of Firearms and Toolmark Examiners ('AFTE'), individual characteristics 'are unique to that tool and distinguish it from all other tools.'" *Id.* at 428. In discussing the general acceptance of toolmark identification, the court summarized:

> Courts have observed that the AFTE theory of firearms and toolmark identification is widely accepted in the forensic community and, specifically, in the community of firearm and toolmark examiners. *See United States v. Diaz*, No. 05-167, 2007 WL 485967, at *11 (N.D. Cal. Feb. 12, 2007). Even courts which have criticized the bases and standards of toolmark identification have nevertheless concluded that AFTE theory and its identification methodology is widely accepted

among examiners as reliable and have held
the expert identification evidence to be
admissible, albeit with limitations.  *United
States v. Taylor*, 663 F. Supp. 2d 1170, 1178
(D.N.M. 2009); *United States v. Monteiro*,
407 F. Supp. 2d 351, 372 (D. Mass. 2006);
*United States v. Green*, 405 F. Supp. 2d 104,
122–24 (D. Mass. 2005).

849 F. Supp. 2d at 435.  The district court in *Otero* likewise
concluded that there existed general acceptance of the AFTE
theory among professional examiners as a reliable method of
firearms and toolmark identification.  The government in the
*Otero* case, however, sought admission of the toolmark
identification testimony based on the standard of "to a
reasonable degree of certainty."  *Id.* at 429 n.3.

The issue in this appeal is not the general admissibility of
the toolmark identification testimony, but the "scientific
certainty" standard to which Paul testified.

In *Diaz*, the district court held that the theory of firearm
identification used by the SFPD Crime Lab was reliable
under *Daubert*.  2007 WL 485967 at *1.  However, the judge
also acknowledged the subjectivity involved in a firearms and
toolmark examiner's identification, and concluded, "The
record, however, does not support the conclusion that
identifications can be made to the exclusion of all other
firearms in the world.  Thus, the examiners who testify in this
case may only testify that a match has been made to a
'reasonable degree of certainty in the ballistics field.'"  *Id.*

*Harmless Error*

Even the government is not arguing on appeal that "scientific certainty" is a proper characterization for toolmark identification expert testimony. While there may be some deficiency in the objections to the standard testified to by Paul, it appears that the "scientific certainty" issue was brought to the district court's attention before and during Paul's testimony. A more thorough *Daubert* hearing could have been helpful in handling the "scientific certainty" issue. The issue is then whether the "scientific certainty" characterization was harmless error.

An error is harmless unless it results in actual prejudice, which is demonstrated where "the error in question had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Winzer*, 494 F.3d at 1201 (quoting *Brecht*, 507 U.S. at 623). Although the firearms identification evidence and expert testimony was important in this case, the "scientific certainty" characterization was subject to cross examination which resulted in acknowledgment of subjectivity in the expert's work. In addition, the district court properly instructed as to the role of expert testimony and there was substantial evidence otherwise linking the defendants to the Wilson and Bowser murders. We believe "a reasonable degree of certainty in the ballistics field" is the proper expert characterization of toolmark identification. Any error in this case from the "scientific certainty" characterization was harmless.

## IX.

## WHETHER 18 U.S.C. § 245(b)(2)(B), ON ITS FACE AND AS APPLIED IN THIS CASE, IS A VALID EXERCISE OF CONGRESSIONAL POWER

This Court "review[s] de novo questions of federal constitutional law, as well as questions of statutory construction." *United States v. Kaczynski*, 551 F.3d 1120, 1123 (9th Cir. 2009) (citations omitted).

Defendants Saldana, Martinez, and Cazares argue that their convictions on Count Two of the Second Superseding Indictment should be vacated because 18 U.S.C. § 245(b)(2)(B) is unconstitutional on its face and as applied to this case. Although defendants argue that Section 245(b)(2)(B) exceeds Congress's powers under both Section 2 of the Thirteenth Amendment and the Commerce Clause, defendants also acknowledge that these arguments were rejected in *United States v. Allen*, 341 F.3d 870 (9th Cir. 2003). Defendants concede in their joint opening brief that we are bound, to the extent applicable, to the holding in *United States v. Allen*. Defendants state that the facial constitutional challenge is raised to preserve that issue for later review.

*18 U.S.C. § 245(b)(2)(B) in the Context of a City Street*

18 U.S.C. § 245(b)(2)(B) provides as follows:

(b) Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes

with, or attempts to injure, intimidate or interfere with–

. . .

(2) any person because of his race, color, religion or national origin and because he is or has been--

. . .

(B) participating in or enjoying any benefit, service, privilege, program, facility, or activity provided or administered by the United States[.]

Count Two of the Second Superseding Indictment charges defendants Saldana, Martinez, and Cazares with violating 18 U.S.C. § 245(b)(2)(B) because they "did willfully, by force and threat of force, injure, intimidate, and interfere with Kenneth Kurry Wilson, an African-American man, by shooting him with firearms, because of Kenneth Kurry Wilson's race and color, and because he was and had been enjoying facilities provided and administered by a subdivision of the State, namely the public streets of Los Angeles, California, in and around Avenue 52."

Defendants argue that a street is not a facility within the meaning of 18 U.S.C. § 245, so the statute could not be applied to the facts of this case. Defendants argue that Congress's vague use of the "facility" sets few if any limits on the statute's reach. Defendants note that there are no congressional findings that a hate crime victim's use of a street affects interstate commerce. Defendants also maintain

that there is ambiguity with respect to the definition of "facility" and that the rule of lenity thus requires interpreting the statute as being inapplicable to the facts of the case at hand. No court, however, has accepted these arguments.

In rejecting arguments similar to those made by the defendants in this case, the Second Circuit presented the following persuasive discussion of a street being included in the term "facility":

> Defendants' suggestions to the contrary notwithstanding, the term "facility" clearly and unambiguously includes city streets within its meaning. A "facility" is "something that promotes the ease of any action, operation, transaction, or course of conduct" or "something (as a hospital, machinery, plumbing) that is built, constructed, installed or established to perform some particular function or facilitate some particular end." Webster's Third International Dictionary 812–13 (1966). And a city street undoubtedly "promotes the ease of" travel and transportation within the city and is "built" and "constructed" to "perform [the] function [and] facilitate [the] end" of such travel and transportation. It therefore unambiguously falls within the clear meaning of the text of § 245(b)(2)(B).

*United States v. Nelson*, 277 F.3d 164, 193 (2d Cir. 2002) (alterations in original); *see also United States v. Mungia*, 114 F.3d 1181 (5th Cir. 1997) (per curiam) (streets and sidewalks qualify as facilities under 18 U.S.C.

§ 245(b)(2)(B)); *United States v. Three Juveniles*, 886 F.
Supp. 934, 944 (D. Mass.1995) (same). Defendants fail to
provide a convincing argument that the street was not a
facility under § 245(b)(2)(B). Section 245(b)(2)(B) is
constitutional as applied to this case, and there was no error
in declining to dismiss Count Two of the Second Superseding
Indictment.

## X.

## WHETHER THERE WERE CUMULATIVE ERRORS AT TRIAL WHICH DEPRIVED DEFENDANTS OF THEIR FIFTH AMENDMENT DUE PROCESS RIGHTS TO A FAIR TRIAL

There are some cases where the cumulative effect of
multiple errors may so prejudice a defendant as to require
reversal, even though no single trial error examined in
isolation is sufficiently prejudicial to warrant reversal. Relief
from the effects of cumulative error is appropriate in those
cases where government's case is weak and a defendant is
more likely to be prejudiced by the effect of cumulative
errors. *See United States v. Frederick*, 78 F.3d 1370, 1381
(9th Cir. 1996). The government did not present a weak case
in the case at hand. The overall effect of any errors that were
committed do not violate the Defendants' Due Process rights
to a fair trial.

**AFFIRMED.**